**SYNVENTIVE MOLDING SOLUTIONS, INC., Plaintiff,**

v.

**HUSKY INJECTION MOLDING SYSTEMS, INC., Defendant.**

No. 2:08–CV–136.

United States District Court, D. Vermont.

March 13, 2009.

Ian P. Carleton, Sheehey Furlong & Behm P.C., Burlington, VT, Jay Stelacone, Esq., M. Lawrence Oliverio, Esq., Maria Bautista, Esq., Therese A. Hendricks, Esq., Rissman, Jobse, Hendricks and Oliverio L.L.P., Boston, MA, for Plaintiff.

Karen McAndrew, Dinse, Knapp & McAndrew, P.C., Burlington, VT, Janice V. Mitrius, Esq., Jason Shull, Esq., Katie L. Becker, Esq., Marc S. Cooperman, Esq., Matthew P. Becker, Esq., Banner & Witcoff, Ltd., Chicago, IL, for Defendant.

## OPINION AND ORDER

JOHN M. CONROY, United States Magistrate Judge.

On February 25, 2009, Defendant Husky Injection Molding Systems, Inc. ("Husky") filed a Motion to Compel Discovery (Doc. 98) and a Motion for Relief from Abusive Discovery Practices (Doc. 100) against Plaintiff Synventive Molding Solutions, Inc. ("Synventive"). Synventive responded to these motions on March 4, 2009, and cross-moved for a protective order to end Husky's abusive discovery practices. (Doc. 124). The Court heard oral argument on these motions on March 9, 2009.[1] For the reasons stated below, Husky's Motion to Compel is GRANTED in part and DENIED in part; Husky's Motion for Relief from Abusive Discovery Practices is GRANTED in part and DE-

NIED in part; and Synventive's Motion for a Protective Order is DENIED without prejudice.

### Background

These motions are the most recent manifestation of a virulent discovery dispute between two parties litigating a patent infringement suit.[2] The patent infringement action began on June 27, 2008, when Synventive filed a complaint and a motion for a preliminary injunction against Husky. Husky answered the complaint on October 14, 2008, and filed a counterclaim against Synventive alleging invalidity and misappropriation of trade secrets. (Doc. 30 ¶¶ 14–37).

The alleged infringement concerns injection molding equipment used for the molding of plastic parts.[3] The equipment injects molten plastic through a nozzle into a cold mold cavity where it solidifies to form a molded article in the shape of the cavity-in particular, plastic automobile bumpers. (Doc. 3 at 1–2).

The patented invention is comprised of various parts known as a "hotrunner," "clamping plate," and "integrated actuator assembly" that together deliver a uniform stream of molten plastic to each nozzle of each cavity in consecutive cycle. In addition to creating a high quality molding, it is imperative that the injection equipment operate as often as possible, for as long as possible, in order to maximize productivity.

According to Synventive, the allegedly infringed patents-in-suit cover three distinct benefits, or aspects, of the underlying invention: they (1) allow for a more rapid disassembly and reassembly of these elements for purposes of maintenance and repair ("quick couple" assembly), minimizing the time in which the injection equipment must be dormant; (2) enable adjustment of the axial position of the valve pin in the injection

---

1. This matter was referred to the undersigned for discovery purposes only on March 2, 2009. (Doc. 108).

2. This Order is not likely to be the last word on discovery in this litigation either, as Synventive recently indicated it may file a motion to compel of its own in the near future. (Doc. 124 at 7, n. 7).

3. This Order provides only a basic description of the patents-in-suit necessary to understand the discovery motions presently at issue. Synventive sets forth a detailed description of its patents and theories of infringement in its Motion for Preliminary Injunction. (Doc. 3).

nozzle, which facilitates a precise fit of the valve pin in the nozzle and improves mold quality; and (3) support the valve pin in a unique way, allowing lateral movement of the valve pin which leads to better alignment of the pin in the nozzle and reduced breakage of the valve pin. (Doc. 3 at 6, 9–11). Synventive alleges that Husky has appropriated all three of these benefits, literally infringing 17 separate claims in 3 different patents (the '025, '870, and '116 patents). (Doc. 1 ¶¶ 6–14). Husky denies infringement and argues that the patents-in-suit are invalid. (Doc. 31).

Synventive has moved for a preliminary injunction and expedited ruling (Doc. 3), the hearing for which is scheduled to begin on June 2, 2009. (Doc. 144). Presently before the Court are two discovery related motions filed by Husky, one styled as a motion to compel, the other as a motion for relief from abusive discovery practices. (Docs. 98 & 100). Both seek additional discovery as well as various costs and fees, including those incurred in filing these motions. Synventive additionally filed a cross-motion for relief from Husky's abusive discovery practices (Doc. 124), to which Husky responded on March 6, 2009. (Doc. 134).

### Discussion

### I. Husky's Motion for Relief From Abusive Discovery Practices

In its motion for relief from Synventive's abusive discovery practices, Husky outlines a number of complaints and seeks relief in a variety of forms. (Doc. 100 at 1, 11–12). Essentially, Husky demands that Synventive (1) institute a "litigation hold" to ensure the proper preservation of all evidence currently within its control, (2) correct deficiencies in its document production which allegedly consists of large quantities of irrelevant and unorganized documents, (3) pay the costs and fees associated with Husky's efforts to prove facts that Synventive failed to admit in response to Husky's requests for admission, (4) collect and produce all relevant and responsive documents from key witnesses, and (5) produce Synventive Vice President Vito Galati for, and pay the costs and fees of, a second deposition to supplement testimony already provided.

### A. Litigation Hold

Based on the deposition testimony of Synventive VP Galati, Husky argues that Synventive "never instituted a litigation hold to insure the preservation of documents relevant to this litigation." (Doc. 100 at 2). Synventive argues in response that "Mr. Galati never actually stated whether an official 'litigation hold' was issued at Synventive as a result of this litigation," and that, in any case, the Federal Rules of Civil Procedure list no such requirement. (Doc. 124 at 4–6). Synventive contends that Galati's testimony "merely indicates that [he] cannot remember all the documentation he and his colleagues at Synventive dealt with in connection with this case." *Id.* at 5.

Synventive underestimates the implications of Galati's testimony. For example, Galati stated that he did not know whether any part of Synventive had adopted a document preservation policy as a result of this litigation (Doc. 98, ex. 2 at 56–57), even though "if anyone was aware of whether or not there was a litigation hold on documents," he "would be the one." *Id.* at 58. Galati also indicated that he never personally spoke to anyone at Synventive about retaining documents that might relate to the subject matter of this lawsuit. *Id.* at 59–60. Moreover, Galati testified that he "can't say that (he' s) held onto" all of his own documents relevant to this litigation. *Id.* at 56–60. This testimony is particularly probative of Synventive's preservation efforts because Galati is essentially in charge of managing this litigation from within Synventive.[4]

Combined with the fact that Synventive does not now assert that a proper litigation hold was put in place, Galati's testimony is strong evidence that there was never a company policy, even one limited to only "key players," to properly preserve relevant documents.

Further, Synventive's argument that the Federal Rules do not require litigants to

---

4. Synventive concedes that, "It is true that Mr. Galati is Synventive's chief point of contact with outside counsel in this litigation." (Doc. 124 at 5).

adopt a "litigation hold," though technically accurate, is ultimately not persuasive. The Second Circuit has observed that the "obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). Other district courts in this Circuit have found that this "means that, once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Jacob v. City of New York*, 2009 WL 383752, at *1 (E.D.N.Y. Feb.6, 2009) (internal quotation marks omitted); *see also Treppel v. Biovail Corp.*, 249 F.R.D. 111, 118–119 (S.D.N.Y.2008); *Heng Chan v. Triple 8 Palace, Inc.*, 2005 WL 1925579, at *7 (S.D.N.Y. Aug.11, 2005) ("the utter failure to establish any form of litigation hold at the outset of litigation is grossly negligent.").

Synventive contends that under *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y.2003), corporate litigants are not required to institute a company-wide hold on relevant documents and that, in any case, litigants are "free to choose" their own means of document preservation. (Doc. 124 at 6). But here there is no evidence beyond counsel's representations that "everything has been produced" to rebut Galati's testimony that, to his knowledge, not even a limited preservation policy was put in place. And *Zubulake* states only that litigants are "free to choose" a method to store electronic information, not a general method of evidence retention. *Zubulake*, 220 F.R.D. at 218. In fact, *Zubulake* explicitly says that "[t]he scope of a party's preservation obligation can be described as follows: Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Id.*

Finally, Synventive argues that Husky's motion must fail on this point because "Husky fails to identify a single destroyed or otherwise unpreserved document." (Doc. 124 at 6). But it is difficult to see how Husky could possibly know whether Synventive has destroyed any of its own documents, let alone specific documents it could identify to Synventive or the Court.

■ In light of Galati's testimony, the relevant case law, and Synventive's mere conclusory assertion that it has "lived up to [its discovery] obligations in good faith and to the best of its ability" (Doc. 124 at 4), a Court ordered litigation hold is appropriate as to those Synventive personnel that are likely to possess discoverable evidence. Additionally, Synventive is ordered to file a sworn declaration from an employee with sufficient knowledge describing (1) whether any responsive documents, including electronic files, have been destroyed or otherwise lost since February 1, 2007; (2) the methods used to determine whether any responsive documents have been lost; (3) the extent to which the quantity or nature of the lost or destroyed documentation is unknowable, and (4) the nature and extent of the litigation hold put in place in response to this Order, including the individual Synventive personnel affected by the hold.[5]

## B. Deficiencies In Synventive's Document Production

Husky also claims that Synventive must revise its document production because, "[r]ather than collect and produce relevant and responsive documents in its possession, custody, or control, Synventive ... undertook to ... create and collect over 25,000 pages of irrelevant and non-responsive documents." (Doc. 100 at 4). Husky also complains that this mass quantity of paper was produced as individual pages, without any clips, bindings, slip-sheets, or any other means by which the end of one document can be distinguished from the start of another. *Id.* Husky claims that this disorganized document production violates Fed.R.Civ.P.

---

5. At the March 9, 2009 hearing held on these motions, Synventive did not object to producing such a declaration or instituting a litigation hold, beyond its assertion that such measures would be superfluous.

34(b)(2)(E)(i), which requires a party to produce documents as they are kept in the usual course of business. *Id.*

In response, Synventive argues that all of the documents it produced are responsive, and that the sheer size of its production was caused by Husky's excessively numerous and overbroad requests, stating, "[t]o the extent that Husky takes issue with the volume of material it has received in discovery, the problem stems from the scope of Husky's requests, not Synventive's responses." (Doc. 124 at 8).[6] Synventive provides no response regarding the disorganized way in which it produced these documents.

In particular, Husky argues that Synventive produced nonresponsive documents in the form of Husky's own patents, and printed pages from both Husky's and Synventive's respective websites. (Doc. 100 at 5). Husky claims that after excluding these categories, only about 700 pages "are arguably responsive documents." *Id.* at 4. However, Husky propounded 102 document requests, many of which are extremely broad in scope. For example, request No. 1 asks for "all documents and things relating to the patents-in-suit"; request No. 35 calls for "all documents and things relating to the alleged commercial success of the subject matter shown, described, or claimed in the patents-in-suit"; request No. 39 asks for "all documents and things relating to Husky's injection molding systems, components, or subassemblies thereof"; request No. 24 asks for "all documents and things relating to any and/or all searches or investigations ever conducted by or for Synventive to locate prior art relating to the patentability of the subject matter shown, described or claimed in the patents-in-suit, or to the validity of the patents-in-suit"; and request No. 84 asks for "all documents and things Synventive intends to or may rely upon at a hearing or trial on this action." (Doc. 98, ex. 1).

■ Thus while it may be true that the "producing party [has a] burden to select and produce the items requested rather than simply dumping large quantities of unrequested materials onto the discovering party along with the items actually sought under Rule 34,"[7] it appears that in this case Husky may have received, so to speak, exactly what it asked for. Nonetheless, Synventive should not have produced documents which are plainly not in "its possession, custody, or control." *See* Fed.R.Civ.P. 34(a)(1). In particular, Synventive's production of print-outs from Husky's own website was inappropriate and antithetical to the goals of the discovery process. At oral argument Synventive claimed that it "kept" Husky's website in the ordinary course of business, but only to the extent that anyone with a computer and an internet connection can access Husky's website and click "print." Obviously, this conception of "custody or control" is untenable.

■ The *way* in which Synventive produced these documents (as opposed to the substance of what it produced) is also problematic. Fed.R.Civ.P. 34(b)(2)(E)(i) requires that "[a] party must produce documents as they are kept in the usual course of business or must organize and label them to correspond to the categories in the request." Rule 34(b) "is meant to prevent a party from obscuring the significance of documents by giving some structure to the production. The party arguing that it produced documents as they were kept in the usual course of business bears the burden of showing that the documents were so kept." *Nolan, LLC v. TDC International Corp.*, 2007 WL 3408584, at *2 (E.D.Mich. Nov.15, 2007) (not reported) (internal citations omitted); *see also Pass & Seymour, Inc. v. Hubbell, Inc.*, 255 F.R.D. 331, 333–34 (N.D.N.Y.2008) (not reported) ("The provision authorizing production in accordance with [the option to produce documents as they are kept in the ordinary course of business] was born out of the disfavor shown by courts to the dumping of massive quantities of documents, with no indexing or readily apparent organization, in

---

**6.** Synventive also notes that it has produced "nearly 33,000 documents" in response to Husky's discovery requests. (Doc. 124 at 8). At oral argument, Husky placed the total at 25,805 "pieces of paper."

**7.** 8A Wright, Arthur R. Miller & Richard L. marcus, Federal Practice and Procedure: Civil 3d § 2213 (2002).

response to a document request from an adversary.").[8]

■ In this case, Synventive does not dispute that it failed to organize its document production according to either of the options in Rule 34, and, based on Husky's averments, the production is completely devoid of any organizational structure.[9] (Doc. 124 at 7–9). Accordingly, Synventive is ordered to amend its document production such that the documents are either organized and labeled to correspond to the categories in Husky's document requests, or produced as they are maintained in the ordinary course of business. *Pass & Seymour,* 255 F.R.D. at 333–34 ("Under the provisions of Rule 34(b)(2) a responding party clearly controls the manner in which production will occur, and specifically which of the two prescribed methods of production will be employed.").

In order to produce documents as they are maintained in the ordinary course of business, the producing party must, at a minimum, "provide information about each document which ... would include ... the identity of the custodian or person from whom the documents were obtained, an indication of whether they are retained in hard copy or digital format, assurance that the documents have been produced in the order in which they are maintained, and a general description of the filing system from which they were recovered." *Id.* at 337–38.

In either case, Synventive is also ordered to omit printed pages from Husky's website.

### C. Synventive's Alleged Failure to Collect Documents From Key Personnel

Husky argues that, in addition to its failure to ensure the preservation of relevant documents, "Synventive failed to conduct a reasonable search for responsive documents." (Doc. 100 at 3). In particular, Husky claims that Synventive's primary witness and declarant in support of its motion for a preliminary injunction, Vito Galati, did not collect and produce relevant emails, and that the list of Synventive employees from whom documents were sought was too limited. *Id.* at 3–4.

With regard to emails in the possession of Galati, it is true that his deposition testimony reveals he did not adequately search his email files for responsive documents, and that he was aware of certain relevant emails that had not yet been produced. (Doc. 98, ex. 2 at 141–143, 181–184). But Synventive claims that in "response to Mr. Galati's testimony about additional documents, [it] immediately searched for and produced additional emails, photos, and images that Galati identified." (Doc. 124 at 7). At oral argument Synventive represented that this production resulted in about 54 additional pages of material concerning research and development.

It is also true that Galati testified that he only collected documents from Chris Lee, Mark Moss, Barry Moushegian, John Roggenburk, and Nancy Tarbox. (Doc. 100 at 3–4, ex. 1 at 151–152, 166).[10] But, as Synventive correctly points out, Husky makes absolutely no effort to explain why this is problematic, or why the Court could reasonably expect that a search for documents in the files of any other Synventive employee would uncover responsive evidence. (Doc. 124 at 9).

Finally, Husky argues that Synventive should be compelled to collect and produce responsive documents from the files of Synventive's President of North American Operations, Bill Hume. (Doc. 100 at 3). Husky points to Hume's deposition testimony in which he indicates he has not collected any

---

8. The Advisory Note to the 1980 Amendment to Rule 34 also makes clear that subdivision (b) is intended to ensure that parties do not "deliberately ... mix critical documents with others in the hope of obscuring significance."

9. Even if Synventive took the position that it produced documents as they were maintained in the ordinary course of business, it would be its burden to demonstrate that fact. It could do so by "revealing such information as where the documents were maintained, who maintained them, and whether the documents came from one single source or file or from multiple sources or files." *Nolan, LLC,* 2007 WL 3408584, at *2. Of course, this is not an exercise in which Synventive even begins to engage.

10. At oral argument Synventive represented that documents were collected from President of North American Operations Bill Hume and Jim Wang as well.

documents out of his own files for production.[11] But Husky neglects to cite the exchange in Hume's deposition, in which Hume describes his understanding that any responsive documents in his files have already been produced by other custodians. *Id.* at 24–25. Further, Synventive denies that Hume has failed to produce any documents. According to Synventive, "Bill Hume collated, collected, and produced a great deal of documentation that was produced to Husky long before it filed this motion-including financial material, sales records and market studies." (Doc. 124 at 7). At oral argument Synventive explained that while Hume did not produce anything from his own files, he was in fact actively involved in collecting documents related to Synventive's financials from other custodians.

Synventive's explanation on this point is not entirely sufficient. As Husky points out, the identities of those in control of certain documents is information that may be as relevant as the documents' substantive content. Thus, responsive documents in Hume's files should be collected and produced even if they are duplicative of documents already handed over by other Synventive personnel. Accordingly, Synventive is ordered to search the files, including electronic files, of Mr. Hume and produce any responsive documents. Synventive is further ordered to file a sworn declaration by Hume affirming that this search has been dutifully completed.

### D. Synventive's Responses to Husky's Requests for Admission

Husky also accuses Synventive of failing to adequately respond to certain requests for admission that were later proved by Husky during Galati's deposition. (Doc. 100 at 6, ex. 5); *see also* Fed.R.Civ.P. 36. Husky claims that pursuant to Fed.R.Civ.P. 37(c)(2) the Court *must* order Synventive to pay the costs, including attorney's fees, that Husky incurred in order to prove these particular admissions.[12] Husky's claim for relief on this issue is without merit.

Husky argues that the facts asserted in requests for admission numbers 152, 163, 267, 268, 271, and 272 were initially denied by Synventive, an offense sanctionable under Rule 37 since they were later proved during Galati's deposition. These requests fall into two basic categories: requests 152 and 163 ask Synventive to confirm facts regarding "prior art," i.e., patents preceding the patents-in-suit, while the remaining requests consist of facts concerning the functional capabilities of Husky's allegedly infringing products. (Doc. 100, ex. 5).

■ The problem with Husky's claim is that these facts were proven, if at all, during a deposition that Husky admits would have occurred *even if* these requests were fully admitted by Synventive. Thus, there are virtually no costs and fees Husky would not have incurred but for Synventive's responses.[13] Husky recognizes this fact and counters that it "seeks only the travel expenses of one [of the two attorneys that took Galati's deposition], eight hours of that attorney's time, court reporter fees, and videographer fees." (Doc. 100 at 8–9). But this estimation of costs is nothing short of incredible. Gala-

11. "Q: Okay. Have you produced anything from your files for purposes of this lawsuit yet? A: No." (Doc. 100, ex. 2 at 23:11–13).

12. Fed.R.Civ.P. 37(c)(2) states that: "If a party fails to admit what is requested under Rule 36 and if the requesting party later proves a document to be genuine or the matter true, the requesting party may move that the party who failed to admit pay the reasonable expenses, including the attorney's fees, incurred in making that proof. The court *must so order* unless: (A) the request was held objectionable under Rule 36(a); (B) the admission sought was of no substantial importance; (C) the party failing to admit had a reasonable ground to believe that it might prevail on the matter; or (D) there was

other good reason for the failure to admit." (emphasis added); *see also Harolds Stores, Inc. v. Dillard Department Stores, Inc.,* 82 F.3d 1533, 1555 (10th Cir.1996) ("The Rule mandates an award of expenses unless the court finds that an exception applies.").

13. At oral argument Husky alluded to the notion that there are more facts, aside from the six specifically noted in its pleadings, improperly denied by Synventive that Husky must now incur the costs to prove independently. However, Rule 37 does not contemplate such speculative relief, and an award of costs and fees for facts yet unproven is not appropriate. *See,* note 13, *supra.*

ti's deposition lasted, in real time, from 9 a.m. until after 8 p.m.,[14] the testimony goes on for more than 370 pages, and the total time spent by Husky to prove the truth of those facts (supposedly) denied by Synventive consists of 85 total lines and less than 6 pages of testimony at the very end of the deposition. (Doc. 100, ex. 5). Thus, even if Husky were entitled to the costs and fees associated with proving these facts, such costs are at most *de minimus*.

Accordingly, Husky's motion to recover the fees incurred to prove facts that Synventive did not admit is denied.

However, Husky's claim for relief with regard to requests for admission goes further. Despite the fact that in its first *two* discovery motions Husky did not mention any requests for admission beyond the 6 specific requests just discussed, Husky apparently later thought the Court should compel revised responses to all 324 of its initial requests. Consequently, Husky finally dedicated a single sentence to this proposition in its Reply to Synventive's Response in Opposition, stating, "this Court should … compel Synventive to properly respond to the remaining requests." (Doc. 134 at 8).[15]

First, the Court finds that Synventive's responses to those requests concerning the functionality of Husky's products are sufficient, and that no revision is required. Synventive responds to these requests by stating: "Denied because Husky has failed and refused to provide Synventive with accurate detailed drawings or an actual specimen of the [relevant Husky products]." (Doc. 100,

ex. 5). Husky does not deny that such material has not yet been produced. While it may have technically been an error for Synventive to specifically "deny" the admission, Synventive's response clearly indicates that it cannot answer the request without certain material from Husky. There is nothing inherently wrong with such a response under the Federal Rules. Fed.R.Civ.P. 36(a)(4)-(5).[16] And Husky's claim is particularly meritless because Mr. Galati's deposition testimony on these facts was predicated upon certain information already in his possession, as well as other material introduced during the deposition-restrictions by which Synventive is under no obligation to abide.[17]

Synventive's responses to requests concerning prior-art are more problematic.[18] For example, Request No. 152 states: "The Blank Patent discloses a manifold." Synventive's response (which is representative of all its responses to requests of this type) is as follows:

Denied as a misleading attempt to correlate isolated components out of context with the new and unobvious claimed "systems" of the patents in suit. To the extent such isolated components may be described in this document, admitted that such components are shown in a significantly different device, system, and context from the claimed systems of the patents in suit. This document discloses a system having multiple components including one or more of the components stated in this request that are not arranged and not combined with other components and do

---

14. In its Reply to Synventive's Response in Opposition, Husky notes that the on-the-record time for Mr. Galati's deposition was 6 hours and 52 minutes. (Doc. 134–2 at 4). This of course makes little difference.

15. Given this sequence of events, the irony in Husky's later announcement that "In the U.S. system of justice, there is no trial by ambush," is thicker than the mid-January ice on Shelburne Bay. (Doc. 143 at 1).

16. Under Rule 36 Synventive should have asserted both (1) that it made a reasonable inquiry, and (2) that the information known or readily obtainable by it is insufficient to enable it to admit or deny. However, the Court finds that Synventive has met its burden in this regard by

explicitly stating what information it requires to fully admit or deny the stated facts. Moreover, as described *infra*, facts regarding the functionality of Husky's products were not proved in a meaningful way during Galati's deposition.

17. The material introduced by Husky during Mr. Galati's deposition, and upon which Galati was instructed to rely, included a Husky product model. Synventive Counsel Therese Hendricks made a standing objection to the use of the model at the outset of the deposition. (Doc. 100, ex. 1 at 7, 342–343).

18. Because Husky only sought this relief in a reply pleading, the Court afforded Synventive further opportunity to submit a written response. (Doc. 139).

not function as a system in a manner as the claimed systems or methods of the patents in suit.

All of the objections stated above are incorporated herein by reference. Plaintiff objects particularly to this Request to the extent it purports to impose a burden on Plaintiff to review a complex, multi-page technology document and provide a misleading response to a misleading request.

(Doc. 100, ex. 5). Synventive argues that this response is acceptable under Fed. R.Civ.P. 36, which states that "when good faith requires a party to qualify an answer or deny only part of a matter, the answer must specify the part admitted and qualify or deny the rest." Fed.R.Civ.P. 36(a)(4).

■ Husky argues that while qualification may be appropriate in some circumstances, it is unnecessary here and, in any case, Synventive's response is unduly convoluted and argumentative. (Doc. 134 at 6). Husky's view is correct.

First, neither the arguments used by Synventive to justify the qualification nor the qualifications themselves make any sense. Synventive argues that this response is appropriate in light of Husky's improper efforts to "pick and choose isolated elements from the prior art and combine them so as to yield the invention in question," and thus demonstrate invalidity of the patents-in-suit. (Doc. 140 at 4). But the question of whether the inferences Husky seeks to draw from facts like "the Blank Patent discloses a manifold" are impermissible, is entirely separate from the question of whether the Blank Patent does *in fact* disclose a manifold.

Synventive may be correct insofar as it is improper to "pick and choose isolated elements from the prior art and combine them so as to yield the invention in question if such a combination would not have been obvious

at the time of the invention." *Dennison Manufacturing v. Panduit Corp.*, 475 U.S. 809, 810, 106 S.Ct. 1578, 89 L.Ed.2d 817 (1986); *Abbott Laboratories v. Sandoz, Inc.*, 544 F.3d 1341 (Fed.Cir.2008). But it does not follow that inquiries may not be made into whether prior references disclose certain elements in the first place.

Moreover, Synventive's responses border on incomprehensible, and therefore clearly fall outside of the Rule 36 provision permitting good faith qualification. The Rule requires that the part admitted, the part denied, and the part qualified be clearly stated. All of this information is entirely unknowable from reading Synventive's response. Further, Synventive's "denial" on the ground that the admission is "a misleading attempt to correlate isolated components out of context with the new and unobvious claimed 'systems' of the patents in suit," impermissibly presumes some untoward intent behind the request rather than responding to the request itself.

Accordingly, the Court orders Synventive to submit new responses to all requests for admission relating to the functionality of, or elements or claims disclosed by, prior-art references in Husky's initial 324 requests for admission.[19]

Finally, it is worth noting that, in response to request for admission No. 280, Synventive said that it would respond to requests Nos. 280–324 once a protective order covering highly confidential financial information was put in place. (Doc. 100, ex. 12). With a protective order now in place (Doc. 79) it is expected that, to the extent not already completed, Synventive will provide responses to these requests for admission.

### E. Husky's Claim For a Second Deposition of Mr. Vito Galati

■ Husky also seeks a second deposition of Synventive Vice President Vito Galati, ar-

---

19. This is not to say that Synventive is entirely precluded from submitting qualified responses. But it must do so for a reason based on its inability to answer the precise request posed. For example, at oral argument Synventive suggested that it could not say whether a certain patent discloses a "manifold" because the term "manifold" may rely on different meanings depending on the contexts in which it is used. If this is in fact Synventive's position, it is free to

qualify an admission accordingly, but it must do so clearly and concisely, and it must erase all doubt as to what it admits and denies. *See generally Vermont v. Staco, Inc.*, 684 F.Supp. 822, 829 (D.Vt.1988) (recognizing that the primary function of Rule 36 "is to sift out triable issues."), *vacated in part on other grounds, Vermont v. Staco, Inc.*, 1989 WL 225428 (D.Vt. Apr.20, 1989).

guing that Synventive Attorney Therese Hendricks engaged in sanctionable conduct under Fed.R.Civ.P. 30 during his first deposition on February 17, 2009. (Doc. 100 at 9). Although Hendricks may have, on occasion, crossed the line between zealous advocacy and deliberate frustration of the deposition, her conduct does not warrant sanctions under Rule 30.[20]

Rule 30(c)(2) states that an "objection must be stated concisely in a nonargumentative and nonsuggestive manner. A person may instruct a deponent not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the court, or to present a motion under Rule 30(d)(3)." And under Rule 30(d)(2), "[t]he court may impose an appropriate sanction-including the reasonable expenses and attorney's fees incurred by any party-on a person who impedes, delays, or frustrates the fair examination of the deposition." Moreover, an Advisory Committee note to the 1993 Amendments to Rule 30 makes clear that "[t]he making of an excessive number of unnecessary objections may itself constitute sanctionable conduct."

In support of its claim, Husky argues that Attorney Hendricks improperly objected to "the overwhelming majority of questions," and "posed multiple objections at least 330 times," and "appears on at least 248 pages of the 350 page rough transcript." Husky notes that the 248 pages comprise more than 70% of the pages in the deposition. (Doc. 100 at 10). Husky also cites a number of cases in which other courts found sanctions, such as the award of costs and fees, to be appropriate under Rule 30 for conduct dur-

ing a deposition. *See, e.g., Sicurelli v. Jeneric/Pentron, Inc.,* 2005 WL 3591701 (E.D.N.Y. Dec.30, 2005); *Heriaud v. Ryder Transportation Services,* 2005 WL 2230199 (N.D.Ill. Sept.8, 2005).

The transcript makes clear that Ms. Hendricks' conduct during Galati's deposition was at times targeted to frustrate Husky's attempt to depose a critical witness. For example, Ms. Hendricks incessantly relied on the objections of "form," "lack of foundation," and "misleading," when it is clear from the record that such objections were baseless.[21] (*See, e.g.,* Doc. 100, ex. 1 at 253, 265, 271, 275, 287, 288, 303, 307, 309, 310, 321, 322, 324, 326, 327, 330, 334).[22] There were also a number of instances in which Ms. Hendricks clearly coached the witness and began testifying on the record herself. *Id.* at 119, 136, 214–215, 241–242, 313–314, 336–338.[23] She also made repeated references to what was, according to her, a standing objection made at the beginning of the deposition, and found other means by which she could disrupt the questioning, such as by asking that questions be read back on an inordinate number of occasions. *Id.* at 45–47, 64, 329.

Nonetheless, Ms. Hendricks' conduct clearly did not rise to the level of the behavior described in the cases cited by Husky, in which opposing counsel engaged in ad hominem personal attacks and the depositions were ultimately rendered "worthless." *See Heriaud,* 2005 WL 2230199, at *8; *Sicurelli,* 2005 WL 3591701, at *8 (finding that counsel's "unprovoked personal attack upon opposing counsel's legal experience was unprofessional and unwarranted."). Instead, this

---

**20.** Husky apparently does not seek sanctions under 28 U.S.C. § 1927, which would require a higher showing of bad faith.

**21.** At one point counsel for Husky, Marc Cooperman, confirmed with Mr. Galati that his question was not misleading. (Doc. 100, ex. 1 at 291).

**22.** For example: "Q: And is it your testimony that the ring is equivalent to the mounting screws? MS. HENDRICKS: Objection. No foundation. Misleading. Calls for a legal conclusion." *Id.* at 287:14–18; "MR. COOPERMAN: How is asking Mr. Galati about what additional information he needs asking for a legal conclusion?" MS. HENDRICKS: Well, the

ultimate question that you had asked has to do with infringement, that's a legal conclusion. MR: COOPERMAN: My question wasn't about infringement. It was simply about what additional information he needs. "MS. HENDRICKS: Well, if you want to just take your one question and isolate it from everything else that you said before and after, I suppose you could, but I'm not sure what value it would be then." *Id.* at 337:18–338:4.

**23.** For example: "MS. HENDRICKS: Objection. I also object on the basis that it calls for a legal conclusion. MR. COOPERMAN: Did you just interrupt your witness as he was testifying? MS. HENDRICKS: Yes. I did." *Id.* at 241:21–242:2.

case is much closer to *Phillips v. Mfrs. Hanover Trust Co.*, 1994 WL 116078, at *3–4 (S.D.N.Y. Mar.29, 1994), in which the Court declined to levy sanctions under Rule 30 where counsel's voluminous, unwarranted and often argumentative objections "verge[d] on frustrating the fair examination" of the deponent, but opposing counsel was not prevented from completing the deposition. Here, notwithstanding some justified frustration, Mr. Cooperman was able to complete the deposition and elicit responses even to those questions Ms. Hendricks barely allowed him to finish. And, importantly, Ms. Hendricks did not instruct Galati not to answer a question unless there was a legitimate assertion of some privilege.

Finally, at oral argument Husky suggested some subject areas that it was not able to fully address at Galati's first deposition. However, the primary factor identified by Husky for this inability is the late production of certain documents, not the obstructionist conduct of Ms. Hendricks. The Court rejects this basis for a new deposition for two reasons: (1) this rationale is not explained anywhere in Husky's several pleadings on these issues; and (2) given the current tumultuous state of discovery in this case, an order compelling a second deposition on this basis, without some further exigent circumstance, would establish a dangerous and potentially costly precedent that would be too easily exploited.

Accordingly, the Court finds that Synventive should not be ordered to bear the costs of a second Galati deposition. *See Morales v. Zondo, Inc.*, 204 F.R.D. 50, 53 (S.D.N.Y.2001) (explaining that the decision to impose sanctions against an attorney for improper conduct during a deposition is within the discretion of the court).

In sum, Husky's motion for relief from Synventive's Abusive Discovery Practices is GRANTED in part and DENIED in part. Specifically, the Court orders: (1) Synventive to institute a formal "litigation hold" to preserve evidence, and to file a declaration from an appropriate Synventive employee that complies with the specifications of this Order;

(2) Synventive to revise its document production in accordance with Fed.R.Civ.P. 34(b) as explained in this Order; (3) Synventive to search the files of Bill Hume to collect and produce responsive documents, and to file a declaration signed by Mr. Hume in accordance with this Order; (4) Synventive is not required to pay the costs and fees incurred to prove certain admissions, but is required to submit new responses to requests for admission concerning prior-art as specified in this Order,[24] and (5) no sanctions, including a second deposition, are appropriate under Rule 30 for Ms. Hendricks' conduct during Mr. Galati's deposition.

## II. Husky's Motion to Compel Discovery

In its Motion to Compel Discovery (Doc. 98), Husky moves to compel complete responses to its interrogatories and document requests. Specifically, Husky moves under Fed.R.Civ.P. 37(a), (c), and (d) for an order compelling Synventive to: (1) supplement its deficient production of documents that are responsive to Husky's First, Second, and Third Sets of Requests for Production; and (2) provide full and complete responses to Husky's Interrogatory Nos. 1, 3, 4, 6, 7, 9, and 11–15. (Doc. 98 at 1).

### A. Synventive's Responses to Husky's Interrogatories

At the outset, the Court takes note that Synventive repeatedly relies on the improper objection that the interrogatories call for "documents and information in Defendants' possession and not produced to plaintiff as requested and required." (Doc. 98 at 6). Synventive makes this objection even to interrogatory No. 9, which asks for information relating to Synventive's own financial information. (Doc. 98, ex. 5). Clearly, this objection is not only inappropriate but nonsensical. And though it is not critical to any of Husky's specific claims in the present motions, the Court cautions Synventive that such haphazard use of boilerplate objections is counterproductive and, in the future, could be grounds for further discovery sanctions.

---

**24.** This, of course, does not include its responses to requests Nos. 280–324, for which Synventive previously agreed to provide responses once a protective order was put in place.

Husky propounded what are ostensibly 15 total interrogatories. (Doc. 98, ex. 5–7). Synventive argues that the interrogatories actually total more than 25, thus exceeding the maximum number permitted under the Federal Rules. Fed.R.Civ.P. 33(a)(1). Synventive objected to, and refused to answer interrogatories 11–15 on this ground. At this point, though, the issue of numerosity appears to be moot in light of Synventive's recent agreement to answer 10 additional interrogatories. (Doc. 124 at 3). Thus, if Husky still seeks answers to interrogatories 11–15, Synventive seems willing to provide them.

Next, the Court turns now to the individual interrogatory responses about which Husky complains.

### i. Inadequate Responses

Husky's *interrogatory No. 1* seeks Synventive's infringement contentions including claim constructions. Husky believes Synventive's response is deficient because it fails to provide its proposed constructions for any of the claim terms at issue. (Doc. 98 at 6). Synventive responds not by objecting to the interrogatory, but by asserting that it has in fact produced its proposed claim constructions. (Doc. 124 at 23–24). Synventive is wrong.

■ Synventive's response to interrogatory No. 1 provides a chart listing claim terms along with citations to their use in the patents' specification. It also incorporates by reference Synventive's response to interrogatory No. 2, which includes a detailed "claims chart" describing the claim elements of the patents-in-suit, along with the corresponding Husky product feature that Synventive believes infringes on each particular claim. (Doc. 98, ex. 5). Notwithstanding Synventive's protestations to the contrary, its responses simply fail to set forth proposed claim constructions.

Under 35 U.S.C. § 112, a U.S. patent contains one or more "claims," which "particularly poin[t] out and distinctly clai[m] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112; *Markman v. Westview Instruments, Inc.*, 517 U.S.

370, 373, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). The "claim defines the scope of the patent grant, and functions to forbid not only exact copies of the invention, but products that go to the heart of an invention but avoids the literal language of the claim by making a noncritical change." *Id.* at 373–374, 116 S.Ct. 1384 (internal quotation marks omitted). Patent claims are distinct from the patent's specification, the purpose of which is to describe the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art ... to make and use the same." *Id.* (quoting 35 U.S.C. § 112).

"Victory in an infringement suit requires a finding that the patent claim covers the alleged infringer's product or process, which in turn necessitates a determination of what the words in the claim mean." *Id.* at 374, 116 S.Ct. 1384 (internal quotation marks omitted). This task, determining what the words in the claims mean, is precisely what is at issue in Husky's interrogatory that asks Synventive to provide its "construction" of the patents' claim terms.

■ Ultimately, the goal in claim construction is to determine the "ordinary and customary meaning of a claim term," which is defined by "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–1313 (Fed.Cir.2005).

At oral argument, Synventive argued that its response achieves this end because it included citations to certain terms as they are used in the patents' specification, and the process of finding the "ordinary and customary meaning of a claim term" begins with its use in the context of the specification. To a certain extent, Synventive is correct. The ways in which a patent's specification rely on and describe a claim term are generally a critical piece of information for ultimately interpreting the term. As the Federal Circuit recently stated, "claims must be read in view of the specification, of which they are a part ... the specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."

*Id.* at 1315; *see also Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452 (Fed.Cir.1985) ("The descriptive part of the specification aids in ascertaining the scope and meaning of the claims inasmuch as the words of the claims must be based on the description. The specification is, thus, the primary basis for construing the claims.") But the law also permits the consideration of other evidence to interpret claim terms, including "intrinsic" evidence such as "the words of the claims themselves, the remainder of the specification, [and] the prosecution history," as well as "extrinsic" evidence "concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Phillips*, 415 F.3d at 1314 (internal quotation marks omitted).

Thus while Synventive cites to a term in the specification, that is not tantamount to providing a proposed *meaning* of the term. For example, in *Phillips* the Federal Circuit interpreted the term "baffles," and explained that while the specification describes how "baffles" could be positioned so as to deflect projectiles, "it does not imply that in order to qualify as baffles within the meaning of the claims, the internal support structures must serve the projectile-deflecting function in all of the embodiments of all the claims." *Id.* at 1325.

Thus despite the undisputed prominent role of the specification in constructing claim terms, its description of a term or its function does not necessarily equate to a construction of that term. This is especially true here, where Synventive has failed even to state the extent to which it relies on the specification for its construction of the claim terms, instead ambiguously stating that the "chart of select terms [is] set forth solely for purposes of cooperation in attempting to provide a good faith response to this interrogatory." (Doc. 98, ex. 5).

Additionally, the claim charts provided by Synventive are also insufficient, since one cannot determine whether the chart is accurate, i.e., whether the listed Husky features actually infringe the claims of Synventive's patents, unless (1) a set of disputed claim terms, if any, is known, and (2) a construction of those disputed claims is established.[25]

Having not offered any further specific objection to this interrogatory, Synventive is ordered to revise its response to interrogatory No. 1 by providing actual proposed constructions of the claim terms for which it believes construction is required, and not mere references to the terms as they are used in the specification. *See Vivid Technologies, Inc. v. American Science & Engineering, Inc.*, 200 F.3d 795, 803 (Fed.Cir.1999) ("only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy."). Synventive shall also provide citations to all of the evidence upon which it relies for its constructions.

Husky's complaint with regard to *interrogatories 4 and 9* is merely that Synventive failed to identify the Bates numbers of the documents from which Husky can obtain an answer to its interrogatories as required by Rule 33(d).[26] (Doc. 98 at 6–7). Synventive notes that Husky also did not provide Bates numbers in any of *its* interrogatory responses, at least not until Husky filed the present motions. (Doc. 127). But while this may be further evidence of the general gamesmanship engaged in by both parties, it is not relevant to Synventive's own discovery obligations. Since the production of relevant Bates numbers is required, and the burden to do so is *de minimus*, Synventive is ordered to revise its responses to interrogatories 4 and 9 accordingly.

### ii. Adequate Interrogatory Responses

Husky argues that Synventive's response to *interrogatory No. 3*, which seeks the dates and locations of conception and reduc-

---

**25.** Additionally, Husky has already produced a number of claim constructions in this case, and these clearly include a proposed definition *in addition* to citations to examples of how the term is used in the patents' specification. (Doc. 31–6).

**26.** "If the answer to an interrogatory may be determined by examining ... a party's business records ... the responding party may answer by ... specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could." Fed.R.Civ.P. 33(d)(1).

tion to practice for the patents-in-suit, is deficient because it "refers to potential documents but fails to indicate whether it has identified any such other documents showing a different date for conception or reduction to practice with respect to one or more of the patents-in-suit, other than the filing date of the '025 patent." (Doc. 98 at 6). But Synventive's response clearly states that, "the filing date of the '025 patent in suit is a constructive conception and reduction to practice date for all of the patents in suit." (Doc. 98, ex. 5). In other words, the response appears to indicate that there are no other documents "showing a different date for conception or reduction to practice" with regard to the other patents. Moreover, at oral argument Synventive represented that it is unlikely to rely on a conception or reduction to practice date earlier than the filing date. Accordingly, Synventive's current response to this interrogatory is sufficient; however, the response should be revised if and when Synventive decides to rely on an earlier date.

*Interrogatory 6* seeks "Synventive's contentions regarding validity of the patents-in-suit including identifying any elements in the patents-in-suit that are not found in the prior art references known to Synventive." Husky objects to Synventive's response because it does not address the prior art references identified in the Supplemental Declaration of Husky's technical expert, Fred Steil. (Doc. 98 at 6–7). As an initial matter, Mr. Steil's supplemental declaration was not even filed until February 3, 2009, whereas this interrogatory was initially submitted to Synventive in October of last year. That alone would be enough to find that no revised response is necessary, but the Court finds further that Synventive's response is adequate, especially in light of other discovery such as deposition testimony already conducted on this issue.

In sum, Husky's Motion to Compel Complete Responses to Interrogatories is granted

only as to interrogatory Nos. 1, 4, and 9, and denied in all other respects. This, of course, is dependent on Synventive's agreement to answer 10 additional interrogatories, despite its belief that Husky has already exceeded the 25 interrogatory limit.[27]

**B. Synventive's Response to Husky's Three Requests for Production**

Pursuant to Fed.R.Civ.P. 34, Husky has made three separate requests for the production of documents and things, making a total of 102 separate document requests. Synventive's general response with regard to document production is that it has already produced more than 30,000 documents, and therefore cannot reasonably be expected to produce anymore. (Doc. 124 at 16). Of course, this quantity can just as easily be evidence of bad faith as good, especially considering the unorganized fashion in which Synventive produced its documents. (Doc. 134 at 4).

**i. Husky's First Request For the Production of Documents and Things**

With regard to Husky's first request for production, Husky asks the Court to compel further responses with regard to requests 1, 2, and 69–71 listed therein. It also seeks production of certain categories of documents listed on pp. 3–4 of its Motion to Compel to which Synventive did not previously object, but have yet to be produced. Synventive now responds that it has produced documents falling within the majority of categories described in Husky's motion. (Doc. 98 at 4; Doc. 124, at 21).

At this point, Husky principally complains that it has yet to receive any documents falling into the following categories: (1) periodic project reports from operations to management; (2) monthly forecasts from Synventive's sales managers; (3) monthly financial reports; (4) monthly booking reports; and (5) quarterly presentations for the Board of Directors.[28] Synventive argues

---

**27.** Husky originally sought relief with regard to interrogatory No. 7 as well, but has since withdrawn that claim.

**28.** These categories correspond to those listed as numbers 9–13 on p. 4 of Husky's Motion to

Compel (Doc. 98) as those identified by Mr. Galati during his deposition.

that such documents are nonresponsive and irrelevant, and therefore ought not be produced. (Doc. 124 at 21). Synventive is correct, but only in the sense that these categories, strictly construed, are overly broad. Accordingly, Synventive is ordered to produce all non-privileged documents in the 5 categories listed above that relate to the patents-in-suit or to the products derived from or relying on the patents-in-suit.

Request No. 2 seeks documents relating to or constituting communications between Synventive and any person "concerning" the patents-in-suit. Husky objects to Synventive's current response because Synventive has unilaterally narrowed this request to include only communications between Synventive and *Husky*. Synventive argues this is necessary because otherwise this "request is clearly overbroad, since it calls for production of every single communication, for instance, between Synventive and any subcontractor that made products involving the patented technology or any customer who purchased such products over the life of these patents." (Doc. 124). Synventive characterizes this request as a "fishing expedition." *Id.*

At oral argument Husky proposed a modification to narrow this request which would replace the word "concerning" with "referencing," such that it would call for only those documents that actually reference one or more of the three relevant patent numbers. Especially since Synventive stated it is not troubled with this change (it stated that all such documents have already been produced), Husky's proposed modification to the request is adopted, and Synventive is ordered to revise its response.

Conversely, with respect to requests 69 and 70, Synventive's arguments are not at all persuasive. (Doc. 124 at 17–18). Synventive objects to request No. 69 because, "if literally construed ... [it] covers documents sufficient to identify subcontractors making components for products involving technology

covered by the patents in dispute, but that may have nothing to do with the disputed claims." *Id.* But Synventive provides no argument as to why producing such documents could not reasonably be expected to lead to admissible evidence, or why it would be unduly burdensome to engage in such discovery. Synventive objects to request No. 70 because it "arguably calls for *all documents*, of any kind, ever generated by Synventive." *Id.* This is plainly false, however, because the request is limited to "agreements and contracts." *Id.* at 17. Accordingly, Synventive is ordered to produce any non-privileged documents responsive to document requests 69 and 70.[29]

Finally, with respect to request No. 71, Synventive claims to have produced "hundreds of documents responsive to this request." According to Synventive, this occurred on February 17. *Id.* at 18. In any case, request No. 71 is largely duplicative of other requests, and is subsumed within the 5 categories of documents discussed *supra* for which Synventive is now compelled to produce responsive material. Thus Husky's motion with regard to request No. 71 is denied.

### ii. Husky's Second and Third Requests for the Production of Documents and Things

Synventive wholly refused to produce documents in response to requests for production Nos. 2 and 3. Synventive only argues, presumably under Fed.R.Civ.P. 26(b)(2)(C), that these document requests are duplicative as well as excessive in light of the 88 individual inquiries made in Husky's first document request. Given the breadth of Husky's First Set of Document Requests, these subsequent requests are duplicative, and ultimately subsumed within prior requests. Moreover, these requests also appear to be subsumed within the categories of documents noted above, to which Synventive should be compelled to respond, if any responsive evidence

---

**29.** As mentioned above, Husky also seeks to compel production pursuant to First Production Request No. 1. However, since this broad request calls for "all documents and things relating to the patents in dispute," the Court finds no reason to grant Husky's motion on this request, and believes that doing so would only write an invitation for Synventive to produce more documents that Husky simply will not want or need. Instead, the Court believes that its rulings to compel the production of other sets of documents will adequately cover the legitimate intent of this particular request.

exists. Accordingly, Husky's motion on these claims is denied.

In sum, Synventive is ordered to revise its responses to interrogatories 1, 4, and 9 according to this Order, and to supplement its production of documents in response to Husky's First Document Request Nos. 2, 69, and 70, as specified in this Order, and to the 5 categories of documents identified on pp. 28–29 of this Order. Finally, Synventive shall produce any non-privileged documents responsive to document requests to which it did not object, and any documents subject to a privilege shall be identified as such by means of an appropriate privilege log. See Fed.R.Civ.P. 26(b)(5)(A). Of course, in light of this Court's Order as well as the Rules of Federal Procedure, all new documents shall be produced in accordance with Rule 34(b). Thus to this extent Husky's Motion to Compel is granted and in all other respects denied.

## III. Synventive's Cross Motion for a Protective Order for Relief from Husky's Abusive Discovery Practices

In its Response in Opposition to Husky's discovery motions, Synventive filed a cross-motion for a protective order that would bar Husky from (1) "propounding any further document requests"; and (2) "propounding any further requests for admission in this litigation." This claim does not merit lengthy consideration at this time.

At the very least, it would seem odd to at once hold that Husky is entitled to corrected document production and admission responses, and also that Husky's use of such tools has been so abusive that it must be outright barred from using them. And in any case, there simply is not evidence in the record to support the extraordinary remedy of completely tying Husky's hands with regard to prospective discovery.

Accordingly, Synventive's Cross Motion is DENIED without prejudice, and may be renewed at some later date if necessary.

## IV. Conclusion

The Court has not turned a deaf ear to Synventive's insistence-both in its pleadings and during oral argument-that it has simply produced all there is to produce, and that a court order to compel anything is superfluous. Nor does the Court believe Synventive's unwavering confidence in this regard to be disingenuous. Rather, the problem is that the basis for this confidence was not adequately articulated in Synventive's responses to Husky. Thus, this Order is necessary to ensure that Synventive's own conceptions of relevance and responsiveness, however well intentioned, do not take primacy over the specific discovery requests Husky did-and was every bit entitled to-render.

For all of the foregoing reasons, and according to all of the specifications described above, Husky's Motion for Relief from Abusive Discovery Practices (Doc. 100) is GRANTED in part and DENIED in part; Husky's Motion to Compel (Doc. 98) is GRANTED in part and DENIED in part; and Synventive's Cross–Motion for Relief from Abusive Discovery Practices (Doc. 124) is DENIED without prejudice. No costs or fees. See Fed.R.Civ.P. 37(a)(5)(C).